1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                   NORTHERN DIVISION

3   _____

DOUGLAS STANLEY and DEBORAH STANLEY          PLAINTIFFS
4

5   VS.                    CASE NO. 1-11-CV-083 BSM

6   CHARLES CAPPS MINISTRIES, INC.;
    DIAMOND BLUFF ESTATES, LLC.;
7   CHARLES CAPPS and PEGGY CAPPS
    INDIVIDUALLY and as HUSBAND and WIFE;
8   and ANNETTE CAPPS, INDIVIDUALLY       DEFENDANTS

9   _____

10          ORAL DEPOSITION OF DOUGLAS STANLEY

11              December 4 and 5, 2012

12  _____

13

14

15

16

17

18

19

20

21

22              ◻ ORIGINAL

23

24              BUSHMAN COURT REPORTING
                620 West Third, Suite 302
25              Little Rock, Arkansas   72201
                     501.372.5115

              BUSHMAN COURT REPORTING


EXHIBIT
B

1    tank.

2    Q.     Paragraph nine discusses a survey.  Do you

3    recall whether you got a survey from the sellers?

4    A.     Yeah, I think it came later.

5    Q.     You think it came later after the contract,

6    after you closed on the property or --

7    A.     No, I think we had it by closing.  I don't

8    think we had it at that point when we were there

9    visiting.

10   Q.     Do you recall reviewing the survey?

11   A.     Sure, when we got it.  I think we received it

12   by mail.

13   Q.     As we sit here today, are you aware of any

14   problems with that particular survey?

15   A.     No.

16   Q.     Paragraph ten talks about title requirements.

17   Paragraph B is marked, and it looks like that you're

18   asking the seller to furnish an owner's title policy

19   in the amount of the purchase price.  Is that what --

20   is that what you were intending to offer the sellers?

21   A.     I don't recall.

22   Q.     Do you recall whether you got, in fact, after

23   closing or at closing you got a title policy?

24   A.     I don't re -- I think we got one as part of the

25   closing process.

1  Q.    Do you have any claim that's related to whether

2  the Defendants gave you a proper title policy?

3  A.    No.

4  Q.    Let me direct your attention to Paragraph 16.

5  It's on page six of nine.

6  A.    Got it.

7  Q.    Plaintiff 45.  Did you read Paragraph 16 before

8  you signed the contract, Mr. Stanley?

9  A.    I suspect we did.

10 Q.    Did you understand it at that time you signed

11 it, Mr. Stanley?

12 A.    Yes.

13 Q.    Did you understand that you were not to rely on

14 representations or statements made by the seller,

15 except if it was written in the Disclosure Statement?

16 A.    Yes, except most of these appear for a home,

17 though.  We weren't buying a home.  There is no

18 improvements.  There are no appliances.  There's no

19 plumbing, no electrical, so it doesn't apply.

20 Q.    Well, what about the quality, the value or

21 condition of the property?  That would seem to apply.

22 A.    Okay.  Condition and value, I can see --

23              MR. RULE:  I'm going to object to the

24              question; it's calling for a legal

25              conclusion.

1   sections you believe the sellers misrepresented.

2   A.    (Witness reviews document.)   Number two has

3   been it seems continuous problems with.

4   Q.    Well, let's talk about two.

5   A.    Okay.

6   Q.    We will just do them one at a time to keep it

7   simple.   So you believe that the sellers

8   misrepresented number two in that there were problems

9   with the private sewer and water system, septic

10   system, well water, or other systems or utilities

11   servicing the property; is that correct?

12   A.    At some point, yes.

13   Q.    Okay.   Do you believe -- what evidence do you

14   have that there was a problem with the private sewer,

15   water, septic, water well, or other system as of

16   April 2006 when you looked at the, when you looked at

17   Lot 153?

18   A.    That, I don't know.

19   Q.    Do you have any evidence that there was any

20   problems with it at that time?

21   A.    Back in 2006 I don't know.   I do not.

22   Q.    If you would just -- if you would move through

23   the --

24   A.    Okay.

25   Q.    The next one, and you just tell me where the

1    next one is, and we'll talk about that when you get

2    to it.

3    A.    (Witness reviews document.)   Number eight.

4    Q.    Okay.   You believe that in 2006 when they gave

5    you this 2002 disclosure that there actually had been

6    slippage, sliding and poor soil conditions on Lot

7    153?

8    A.    To the adjacent properties.

9    Q.    Okay.

10   A.    It obviously was not noticeable, or we didn't

11   notice it if it was on property 153.

12   Q.    What evidence do you have that the sellers knew

13   that there was slippage, sliding or other poor

14   conditions on Lot 153 or the adjacent properties?

15   A.    The document that we saw yesterday that we

16   learned from 2003.

17   Q.    Are you referring to what we have labeled as

18   Exhibit 12?

19   A.    Yes.

20   Q.    And that's a letter dated --

21   A.    February 27th, 2003.

22   Q.    And who's it directed to?

23   A.    Ruth and James Mitchell.

24   Q.    Do you have any idea what the surrounding

25   circumstances are, the reason that he -- for the

1    reason that Mr. Capps wrote that letter to the

2    Mitchells?

3    A.    Just from what's in the document itself, so I

4    obviously wasn't there to see it.

5    Q.    Well, when did you find out about that letter

6    again?

7    A.    Yesterday.

8    Q.    Is there any other evidence that you believe

9    would cause the sellers to indicate yes, there were

10   problems with slippage, sliding or other poor soil

11   conditions?

12   A.    The previous landslide that we learned of that

13   was in Fairfield Bay, Stevens Point that had happened

14   in '05.

15   Q.    Do you believe that the 2005 landslide in

16   Stevens Point causes the sellers of your property or

17   the adjacent property to disclose to you that there

18   was a landslide in a different location not related

19   to Diamond Bluff Estates?

20   A.    That there was these conditions in the area,

21   yes.

22   Q.    Well, what --

23   A.    Knowing that it had already occurred on Diamond

24   Bluff and that it had occurred in Fairfield Bay.

25   Q.    Where is Fairfield Bay?

1    A.    Stevens Point.

2    Q.    What evidence do you have that those, that that

3    slide somehow linked or should be linked or is

4    similar to Diamond Bluff Estates?

5    A.    Similar topography, I believe, similar type of

6    development, similar -- similar features of the land.

7    Q.    And who told you that the topography and the

8    geography was the same?

9    A.    That's just my assumption.

10   Q.    I'm going to give you what is marked as Exhibit

11   20, which is a new exhibit, Counsel, it's Plaintiff's

12   1.

13            (Exhibit No. 20 was marked.)

14   BY MR. PITTMAN:

15   Q.    Can you identify that document for me,

16   Mr. Stanley?

17   A.    This is the report on the 2005 landslide.

18   Q.    And flip to page two.  And what's the date?  I

19   think it's at the top of the heading of that

20   particular paper.

21   A.    May 19th.  There's two dates.  There is a

22   March 28th date and a May 19th date.

23   Q.    Where is the March 28th date?

24   A.    Right next to it, right below.  What page are

25   you on?

1   Q.      Page -- the second page of that particular

2   report, or the second page of that exhibit which is

3   Plaintiff two.

4   A.      May 19th, okay, the event was on March 28th.

5   Q.      Okay.  And flip back to the first page of that

6   exhibit.  As I understand it, you found this document

7   on the internet; is that correct?

8   A.      Yes.

9   Q.      Okay.  How did you find this document?

10   A.      I think I was just searching for landslides in

11   the area.

12   Q.      There is an allegation in the, in your Amended

13   Complaint that says that the sellers, the Defendants

14   in this lawsuit tried to conceal or hide this

15   particular landslide from you.  How did they hide or

16   conceal the 2005 landslide from you?

17   A.      I would think by checking this box on the

18   disclosure form knowing that there were situations in

19   the area and as a developer that they had seen it on

20   the road itself a couple of lots away in 2003, and

21   then they saw it over here two years later.

22   Q.      Well, do you have any evidence that the

23   Defendants in this case actually knew about this

24   landslide?

25   A.      It's my opinion that as a developer, a major

1   developer of that area they absolutely should have

2   known it.  This wasn't something that was very small.

3   This was a major event.

4   Q.    Would it be such a major event that a lot of

5   the general public would know as well?

6   A.    I think if you lived in that area, you knew it,

7   and if you worked in this industry in that area you

8   would know it.

9   Q.    And you think that the Defendants had a duty to

10   disclose the 2005 landslide in Stevens Point to you

11   as a buyer?

12   A.    I think a disclosure of that and of the other

13   unstable situations on the road should have been

14   disclosed on the property disclosure form on number

15   eight, I think is what we were looking at, yes.

16   Q.    Look at the first page, look at the very top.

17   It says, South Central Section 42nd Annual Meeting 30

18   March through 1 April 2008.  Is it your understanding

19   that this has been on the internet since 2008?

20   A.    I am not sure.

21   Q.    When did you find this document?

22   A.    After we learned of the landslide on our road.

23   Q.    So based on the timeline on Exhibit 1 that

24   would have had to have been sometime after March of

25   2011?

1    A.    Yes.

2    Q.    So you found this document on the internet by

3    doing a Google search of some sort after March 2011?

4    A.    Yes.

5    Q.    Do you have any evidence that the Defendants in

6    this case were somehow involved with the 2005

7    landslide at Stevens Point?

8    A.    No.

9    Q.    Do you have any reason to believe that this

10   information -- let me strike that.   If this

11   information was generally available to everyone in

12   the area, in the Diamond Bluff Estates area, why

13   wouldn't it have also been available to you when you

14   bought the property in 2006?

15   A.    My opinion would be it's -- it should have been

16   available or should have been known by the people in

17   the industry, again, the people that are developing

18   and selling real estate in that area.

19              To the common homeowners that did not live

20   in Diamond Bluff, maybe not, but those in the

21   business in the Greers Ferry area, absolutely.   It's

22   part of the business.

23   Q.    Look at Plaintiff's nine or page eight of your

24   report.   The second paragraph says, The Bradford

25   family indicated that the house was built around

1   1996.   They stated that they had no problem with

2   slides up to the present slide.

3              Were you aware of that, that prior to 2005

4   the people that owned this house were not aware of

5   any landslides in the area?

6   A.    I can't say that.

7   Q.    I'm asking did you read that part of it?   Were

8   you aware of that sentence?

9   A.    They said that they had no problems with

10  landslides up to that point, not that they had no

11  knowledge of slides in the area.

12  Q.    Okay.   Well, do you have any evidence to

13  suggest that there were other slides in this area

14  before March 28th, 2005 when this Stevens Point

15  landslide allegedly occurred?

16  A.    The 2003 on Diamond Bluff.

17  Q.    What knowledge do you have of the 2003

18  incident?

19  A.    Again, just what is in there, that is in the

20  letter that's consistent with what we have been told

21  by others.

22  Q.    So you don't have any idea of whether we are

23  comparing a similar landslide to a similar landslide

24  in the 2005 and 2003; do you?

25  A.    I would say we are comparing similar stability

```
 1   companies listed in this email?

 2   A.    No, I couldn't tell you which one.

 3   Q.    Do you recall any conversations with a builder?

 4   A.    Yes.

 5   Q.    Before you closed?

 6   A.    Yes.

 7   Q.    Okay.   What conversation do you recall with

 8   that, with that particular builder?

 9   A.    I asked him to stop by and take a look at the

10   lot.

11   Q.    And do you know whether he or she did that?

12   A.    I believe he said that he had went by, I think,

13   and called me, called me back another time and said

14   he had looked at the lot.

15   Q.    How did you find that particular builder?

16   A.    It was a recommendation from, I suspect,

17   Christie.

18   Q.    Do you have any idea whether that particular

19   builder worked with the Defendants in the lawsuit?

20   A.    No, I do not know that.

21   Q.    Or had any connection?

22   A.    I do not know.  I don't recall the builder.

23   Q.    When you discussed the lot with the builder

24   after he stopped by, and, again, I want to confirm

25   the builder stopped by before closing?
```

1   A.     Yes.

2   Q.     Did you discuss any building challenges with

3   the builder?

4   A.     No specific, just a general opinion of the lot.

5   Q.     What was his general opinion?

6   A.     That the lot was a nice lot.

7   Q.     Do you have any idea what his experience was?

8   A.     I believe it was somewhat -- and, again, I

9   don't recall which one, it was someone that was, that

10  was in the general area.  So I don't know about --

11  no, we didn't see any specific work of this.

12  Q.     Did he give you any opinion as to the soil in

13  the area as to whether it would move or not.

14  A.     No.  We talked about different types of homes

15  that he built.

16  Q.     So you never had a discussion with him about,

17  Hey, if I put a home here is it going to slide down

18  the hill?

19  A.     No.

20  Q.     Did he ever mention to you landslides?

21  A.     No.

22  Q.     Do you think if he had that concern with it, he

23  would have mentioned it to you?

24  A.     I would hope so.

25  Q.     Did he discuss with you any experiences he had

1   in the area with building houses in that area?

2   A.   He was a builder in the general area and had

3   done work in that area.

4   Q.   Did you ever have any inspections done of the

5   lot, other than having a builder go and look at it?

6   A.   No.

7   Q.   So you never had any engineer go and look at it

8   and tell you whether the lot was suitable for

9   building?

10  A.   No.

11  Q.   Never -- did you ever have an architect go look

12  at it before closing to help you determine whether it

13  was going to be suitable for building a building?

14  A.   No.

15  Q.   Did you have anybody, other than this

16  particular builder, go out and look at the lot to

17  tell you whether it was conducive for building a

18  house?

19  A.   No.   Other than what we were told going in.   We

20  did not engage ourselves anybody after that.

21  Q.   All right.   I am going to give you Exhibit 11

22  and ask you if you can identify that.

23  A.   Disclosure, the 2006 Disclosure.

24  Q.   And if you'll look at the last page and tell me

25  whether you signed that?

1   A.     Yes.

2   Q.     Like we did with the 2002 Disclosure Statement,

3   we need to walk through, if you would, and tell me

4   where you think --

5   A.     We didn't finish the 2002.  We stopped.  Should

6   we --

7   Q.     Did we not?

8   A.     We did not.  We stopped at number eight.

9   Q.     Well, let's keep going then.  Let's go back.

10          MR. RULE:  What exhibit are you on?

11  A.     Eight.

12  Q.     Eight.  Exhibit 8.  All right.  So we are on

13  page Plaintiff's 55?

14  A.     I think 54.

15  Q.     I'm sorry.  We are on Plaintiff's 54, and we

16  discussed the slippage.

17  A.     Number eight.

18  Q.     So you believe there was a misrepresentation

19  there based on the 2003, 2005, and a 2009 landslide;

20  is that correct?

21  A.     That, and what we've heard from others about

22  the area, yes.

23  Q.     What have you heard from others about the area?

24  A.     That it was -- it's the mountain is unstable

25  and not fit for building.

1    other houses in the neighborhood.  I mean, I think it

2    was pretty obvious that you would have to have

3    multiple levels.

4    Q.    Okay.  Mr. Stanley, I believe your wife

5    testified that the closing occurred on May 22nd,

6    2006, based on the date that was on the deed and the

7    Settlement Statement which were Exhibit 14 and 15.

8    Do you have any reason to dispute that?

9    A.    No.  If that's what all of the dates on the

10   closing documents.

11   Q.    Before you closed on the property, did you ever

12   personally speak with Charles Capps?

13   A.    No.

14   Q.    Have you ever in your lifetime spoken with

15   Charles Capps personally?

16   A.    Yes.

17   Q.    Tell me about that -- well, how many times have

18   you spoken with him?

19   A.    Just once.

20   Q.    Tell me about that conversation.

21   A.    He called me, and I think it was several months

22   after we had purchased the lot, and he had somebody

23   that wanted to buy it, buy the lot and build the

24   house on Lakefront Road.

25        And he had shown them our lot and asked if

1    we -- he asked Charles to ask us if we would sell it

2    so he could build there.

3    Q.    And in hindsight, do you wish you had sold the

4    lot?

5    A.    No comment.

6    Q.    Have you ever in your lifetime spoken with

7    Peggy Capps?

8    A.    No.

9    Q.    Have you ever in your lifetime spoken with

10   Annette Capps?

11   A.    No.

12   Q.    I'm going to give you a copy of Exhibit 17,

13   which is the First Amended Complaint.  Are you

14   familiar with that Complaint or the Amended

15   Complaint, Mr. Stanley?

16   A.    (Witness reviews document.)  Yes.  Generally,

17   not in detail.

18   Q.    Did you review it before it was filed?

19   A.    Yes, I believe we did read it.

20   Q.    All right.  Let me turn your attention to

21   paragraph seven.  But it starts on page two, it goes

22   on to page three.  This paragraph indicates that --

23   well, let me scratch that.

24         Let me direct your attention to paragraph

25   15.  Do you have any evidence to indicate that Three

1    Chimneys acted as the agent for the Capps Defendants?

2    A.     They showed us the property.   They were not the

3    listing agent but they were --

4    Q.     But you don't have any paper that the Three

5    Chimneys Real Estate agency that represented you

6    represented the Capps Defendants; do you?

7    A.     No, I have not seen it in a document.

8    Q.     Okay.   But do you have any witness that will

9    testify that Three Chimneys acted in some way as the

10   Capps' real estate agents?

11   A.     They were not the listing agent of the property

12   but they were showing us properties to purchase that

13   were owned by Capps.   I guess it's the definition of

14   the word "agent."

15   Q.     Well, I guess I'm a little confused.   Did you

16   believe that the Three Chimneys was your real estate

17   agent or the Capps' real estate agent?

18   A.     That the listing agent was Red Apple.

19               MR. RULE:   I'm going object to the

20               form of the question because this requires

21               a very, very subtle legal analysis and

22               conclusion on the document, which is that

23               Plaintiff 34, and 34 which is in itself a

24               model of ambiguity.

25               MR. PITTMAN:   I gotcha, I gotcha.

1    BY MR. PITTMAN:

2    Q.    What did you believe at the time in 2006 when

3    you, when you went to the Three Chimneys Real Estate

4    agency and Christie Dorris, I mean, what did you

5    believe?  Not legally what was, in fact, occurring,

6    but what did you believe?  You believed that Three

7    Chimneys was your real estate agent; correct?

8    A.    That they would show us properties for sale in

9    the area.

10   Q.    But you believed that they were your real

11   estate argent?

12              MR. RULE:  Well, again --

13   A.    They were the real estate agent that we asked

14   to show us properties in the area.

15   Q.    Thank you.  And while somebody might argue that

16   the Capps, whether it's a legal argument or

17   otherwise, someone might argue that the Capps

18   represented or were represented by Three Chimneys, I

19   think is what your attorney is trying to say;

20   however, do you have any paper, do you know of any

21   document that would reflect that?

22   A.    No.

23   Q.    Okay.  That's all.

24              MR. PITTMAN:  Let's go off the record.

25              (Off-the-record discussion.)

1   BY MR. PITTMAN:

2   Q.    Who represented -- in paragraph seven, the top

3   of page three, your Amended Complaint says,

4   Defendants or some of them and their agents

5   represented to Mr. and Ms. Stanley that the lots in

6   Diamond Bluff Estates, including Lot 153, were

7   accessible by passable roads.  Who -- which Defendant

8   made that representation to you?

9   A.    I think anybody that advertised that property

10  on the internet, put a sign up at the sales office

11  and created the MLS listing.

12        Anybody that took us and showed us that

13  lot, they are representing that there was a paved

14  road, and we could use the paved road to get to the

15  property.  Anybody in the real estate process, I

16  guess.

17  Q.    Okay.  Do you have any evidence that Annette

18  Capps was involved in that process?

19  A.    I don't through any of the -- no.

20  Q.    Do you have any evidence that Peggy Capps was

21  involved in the process?

22        MR. RULE:  Well, she is the grantor on

23        the deed.

24        THE WITNESS:  To the extent --

25        MR. RULE:  She is an owner.

1    were putting all of those things for sale and

2    developing of that property, I don't know, but if she

3    was, then yes.

4    Q.    Not my question.  Do you have any specific

5    knowledge or understanding, whether it be a piece of

6    paper or whether it be a witness, that's going to say

7    Annette Capps was involved with that process in 2006?

8    A.    No.

9    Q.    Okay.  Paragraph eight says that you have

10   learned within the eight to nine months that access

11   to your lot has been rendered periodically impassable

12   due to landslides.  Is your lot -- has your lot been

13   periodically impassable due to landslides?

14   A.    Yes.

15   Q.    Have you ever -- are you aware of any instance

16   where if you wanted to go onto your lot that you

17   couldn't have gotten to your lot?

18   A.    Yes.

19   Q.    And when was this?

20   A.    One at the landslide, and then after that also

21   there were instances when the road was not passable.

22   Q.    Okay.  And how do you know this?

23   A.    I received messages.  Obviously, I was not

24   there at the landslide or at the other event, but

25   there were notices that the Army Corp of Engineer and

1    Defendants.

2            Do you have any specific document or

3    witness that you're aware of that's going to testify

4    that Annette Capps participated in a common

5    development sale of properties on or before

6    April 2006 when you purchased your property?

7    A.    I think that's still being determined.  I do

8    not.

9    Q.    Okay.

10   A.    I think that's still something that's being

11   researched.

12   Q.    Look at paragraph 11.  You allege that your lot

13   is subject to continuing landslides and instability.

14   Have you had any soil movement on your lot?

15   A.    Not that I'm aware of.  Not that I have

16   inspected or -- not that I've seen.  It's all around

17   us, but not --

18   Q.    Are you aware of any instability on your lot?

19   A.    There's an area that was -- gravel was dumped

20   on our property.  I think it was part of the repairs

21   when the road, when the landslide came through.

22           So I don't know what they were, what they

23   were doing on the front -- it's on when you first

24   access our property.  They had dumped -- whoever was

25   repairing the road dumped a lot of gravel on the

1   beginning of our property.  We don't know what the

2   cause of that was or...

3   Q.    Was the landslide -- did the landslide affect

4   the property contingent to your property, or was it

5   that they were re-graveling the road and put part of

6   the gravel on your property because it was a

7   spillover when they re-graveled the road?

8   A.    I don't know that.

9   Q.    Okay.  Look at paragraph 19.  It says, On or

10  around May 15th, 2006 Three Chimneys, Christie Dorris

11  and Capps Defendants will represent to Mr. and

12  Ms. Stanley that they had no knowledge of existing

13  problems with landslides or any instabilities with

14  Lot 153 or the surrounding area.

15          Who told you or when did this event or

16  conversation occur that these parties told you we

17  have no knowledge of any landslides?

18  A.    I believe my opinion is this is the disclosure

19  form.  This is referenced in the disclosure form.

20  Q.    No this -- paragraph -- well, so let's talk

21  about this.  So paragraph 19 appears to me to be a

22  specific event, and you're testifying that that is

23  not a specific event.  You think that paragraph 19 is

24  actually referring to the Disclosure Statement?

25  A.    That's what I said, yes.

1  Q.    So you're not aware of any event where there

2  was a conversation held between Three Chimneys,

3  Christie Dorris, and the Capps Defendants where they

4  actually told you we have no knowledge of landslides?

5  A.    Correct.

6  Q.    Look at paragraph 22.   It says, Diamond Bluff

7  Estates Development has similar geological

8  characteristics that make it subject to similar

9  landslides.   What evidence do you have of that, other

10  than your own opinion?

11  A.    Well, we know of multiple cases of it in the

12  same area.   It's the same hillside.   There have been

13  multiple incidents on both sides of our properties.

14  Q.    Have you had anyone with a background in

15  geological characteristics tell you that Diamond

16  Bluff Estates has similar geological characteristics

17  as Stevens Point.

18  A.    No.

19              MR. RULE:   I have.

20  A.    Actually, I take that back.   I have.

21  Q.    Who has told you that, other than Herb Rule?

22  A.    No, no, no, Hank Verser (phonetic).

23  Q.    Hank Verser?   Who is Hank Verser?

24  A.    At the county.

25  Q.    What does Hank Verser do at the county?

1    Capps Ministries or Diamond Bluff Estates, or

2    whoever, any of the Defendants, not disclosing that

3    2005 landslide to you prior to your closing on the

4    property.  That's what I want to talk about now;

5    okay?

6    A.    (Witness nods head.)

7    Q.    All right.  Now, and I don't see it in the

8    Complaint, and I'm not going to go through it

9    paragraph by paragraph, but, I mean, you're generally

10   familiar with it.

11          Mr. Rule prepared it on your behalf, and we

12   have discussed it, you know, here today.  I didn't

13   see -- did any of those Defendants -- did they -- do

14   you think that they just didn't tell you about the

15   landslide, or do you think they took steps to cover

16   up the fact that a landslide occurred?

17   A.    I guess I would have to say both.

18   Q.    Okay.

19   A.    One, if they didn't say, and I suspect they

20   knew, they should have known, and two, on the

21   disclosure form.

22   Q.    All right.  You think the disclosure form was

23   an attempt to cover up the landslide; is that what

24   you're saying?

25   A.    I don't know if cover up because it was, you

1    know, we have seen documents that it was recurring in

2    the area, but it was obviously not mentioned when,

3    when we purchased the property and something that

4    should have been, and do I think that it was

5    deliberate, yes.

6    Q.    Okay.  Did any of the Defendants keep you or

7    attempt to keep you away from inspecting the,

8    personally inspecting the property prior to closing?

9    A.    No.

10   Q.    All right.  Did you ask the Defendants for any

11   records that you did not receive prior to closing?

12   Was there anything you asked them to provide you that

13   they did not?

14   A.    No.

15   Q.    Okay.  When you went and were researching on

16   the internet, when you were looking at landslides at

17   Greer's Ferry or landslides in Van Buren County or in

18   Cleburne County, did you have any trouble retrieving

19   the documents that you found, or once you searched

20   for them were you able to just pull them up?

21   A.    Once I searched and found that there were hits

22   coming back on that, yes, I was able to find it.

23   Q.    Okay.  Did any of the Defendants make any

24   affirmative misrepresentations to you about the

25   property and the fact of whether or not landslides

1    had occurred prior to the time you closed on the

2    land?

3    A.    Verbally?

4    Q.    Yes.

5    A.    Or other than in the disclosure?

6    Q.    Well, we'll do both.  Verbally?

7    A.    Yeah, I didn't.  We didn't have conversations.

8    Q.    Okay.  So no?

9    A.    No.

10   Q.    Okay.  All right.  And then the disclosure

11   forms as we have discussed and are attached here as

12   an exhibit to your deposition, it sounds like you

13   said that that was an affirmative misrepresentation.

14         Other than that disclosure form, are you

15   aware of any other affirmative acts to conceal the

16   fact that there was a landslide in 2005?

17   A.    The fact that they were actively working to

18   repair it and fix it in dealing with some of the

19   people but not notifying all of the homeowners, and

20   it was not the communication of the Diamond Bluff

21   group that we were making payments to was -- you

22   know, we were continuing to make payments for the

23   association, and they were actually working on, it

24   seems a little, seems very curious that they would

25   come in and start to make repairs and yet not notify

1   everybody --

2   Q.    Okay.

3   A.    -- what was going on.

4   Q.    All right.  And then the internet search you

5   did in March 2011, it would have retrieved the same

6   results or similar results as you ran in advance of

7   your closing; correct?

8   A.    I don't know that.

9   Q.    Okay.  And we have, we have some of these

10  documents or you have produced during your --

11  A.    The dates I think show.

12  Q.    Right.  That's what I was going to say is we

13  could refer to the dates on these, but you have no

14  reason to dispute the dates that are on those

15  documents you pulled off the internet; do you?

16              MR. RULE:  Which ones are you talking

17              about?

18              MR. HALL:  Any of the -- I'm trying,

19              for the sake of time, not referring to them

20              individually, but I will do it this way.

21  BY MR. HALL:

22  Q.    You and Ms. Stanley have produced certain

23  documents in response to discovery propounded by the

24  Defendants in this case; correct?

25  A.    Yes.